1  PATRICK D. ROBBINS (CABN 152288)
   Attorney for the United States
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division
4
   GREGG W. LOWDER (CABN 107864)
5  DANIEL PASTOR (CABN 297948)
   Assistant United States Attorneys
6
7       450 Golden Gate Ave., Box 36055
        San Francisco, California 94102-3495
8       Telephone: 415 436-7200
        FAX: 415-436-7234
9       Email: Gregg.lowder@usdoj.gov

10 Attorneys for United States of America

11
                  UNITED STATES DISTRICT COURT
12
                NORTHERN DISTRICT OF CALIFORNIA
13
                    SAN FRANCISCO DIVISION
14

15 UNITED STATES OF AMERICA,              )  CASE NO.  3:25-CR-00012 RFL
                                          )
16         Plaintiff,                      )  RECORDED NOTICE OF LIS PENDENS AS TO
                                          )  REAL PROPERTY AND IMPROVEMENTS
17    v.                                   )  LOCATED AT 3877-3879 JACKSON STREET,
                                          )  SAN FRANCISCO, CALIFORNIA 94118 (APN:
18 ALEXANDER CHARLES BECKMAN, and         )  LOT 019 BLOCK 0990)
   VALERIE LAU BECKMAN,                    )
19         a/k/a Valerie Lau,              )
                                          )
20         Defendants.                     )
                                          )
21 ――――――――――――――――――――――――――――           )

22 //

23 //

24 //

25 //

26 //

27 //

28
   Recorded Notice of Lis Pendens 3877-3879 Jackson Street, SF, CA 94118
   CR 25-0012 RFL
                                    1

1       The United States hereby submits the attached Recorded Notice of Lis Pendens as to Real

2   Property and Improvements located at 3877-3879 Jackson Street, San Francisco, California 94118

3   (APN Lot 019, Block 0990).

4
    DATED: January 24, 2025                          Respectfully submitted,
5
6                                                    PATRICK D. ROBBINS
                                                     Acting United States Attorney
7
                                                     _____/S/_____
8
                                                     GREGG W. LOWDER
9                                                    Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Northern District of California and is a person of such age and discretion to be competent to serve papers. The undersigned further certifies that she caused a copy of

- Recorded Notice of Lis Pendens as to Real Property and Improvements located at 3877-3879 Jackson Street, San Francisco, California 94118

to be served this date via United States certified mail and first class mail delivery upon the person(s) below at the place(s) and address(es) which is the last known address(es):

Scott D. Joiner                                   Valerie Lau
Latham & Watkins LLP                              3877-3879 Jackson Street
505 Montgomery Street, Suite 2000                 San Francisco, California 94118
San Francisco, CA 94111
Attorney for Alexander Beckman

Alexander Beckman                                 Fidelity National Title Insurance Company
3877-3879 Jackson Street                          601 California Street, Suite 1501
San Francisco, CA 94118                           San Francisco, CA 94108

First Republic Bank
111 Pine Street
San Francisco, CA 94111

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of January 2025, at San Francisco, California

_____/S/_____
ILSA WOLF
FSA Paralegal
Asset Forfeiture Unit



**City and County of San Francisco**
**Joaquin Torres, Assessor-Recorder**

<table>
<tr><td>Doc # <strong>2025006749</strong></td><td></td><td>Fees</td><td>$173.00</td></tr>
<tr><td>1/24/2025</td><td>7:35:52 AM</td><td>Taxes</td><td>$0.00</td></tr>
<tr><td>E S</td><td>Electronic</td><td>Other</td><td>$0.00</td></tr>
<tr><td>Pages    54</td><td>Title    030</td><td>SB2 Fees</td><td>$0.00</td></tr>
<tr><td>Customer    2177</td><td></td><td>Paid</td><td>$173.00</td></tr>
</table>

**RECORDING REQUESTED BY:**

UNITED STATES ATTORNEYS OFFICE

**WHEN RECORDED PLEASE MAIL TO:**
AUSA DANIEL PASTOR
UNITED STATES ATTORNEYS OFFICE
450 GOLDEN GATE AVENUE, BOX 36055
SAN FRANCISCO, CA 94102
ATTN: ASSET FORFEITURE UNIT

(DOCUMENT WILL ONLY BE RETURNED TO NAME & ADDRESS ABOVE)

(SPACE ABOVE FOR RECORDER'S USE)

NOTICE OF LIS PENDENS AS TO REAL PROPERTY AND IMPROVEMENTS LOCATED AT
3877-3879 JACKSON STREET, SAN FRANCISCO, CA 94118 (APN: LOT 019; BLOCK 0990)

**(DOCUMENT TITLE)**

SEPARATE PAGE, PURSUANT TO CA. GOV'T. CODE 27361.6

1  PATRICK D. ROBBINS (CABN 152288)
   Attorney for the United States
2  Acting Under Authority Conferred by 28 U.S.C. § 515

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division
4
   DANIEL PASTOR (CABN 297948)
5  GREGG W. LOWDER (CABN 107864)
   Assistant United States Attorneys
6
7       450 Golden Gate Ave., Box 36055
        San Francisco, California 94102-3495
8       Telephone: 415 436-7200
        FAX: 415-436-7234
9       Email: daniel.pastor@usdoj.gov

10 Attorneys for United States of America

11                 UNITED STATES DISTRICT COURT
12
                   NORTHERN DISTRICT OF CALIFORNIA
13
                   SAN FRANCISCO DIVISION
14

15 UNITED STATES OF AMERICA,            )  CASE NO.  3:25-CR-00012 RFL
                                        )
16          Plaintiff,                  )  NOTICE OF LIS PENDENS AS TO REAL
                                        )  PROPERTY AND IMPROVEMENTS LOCATED
17     v.                               )  AT 3877-3879 JACKSON STREET, SAN
                                        )  FRANCISCO, CALIFORNIA 94118 (APN: LOT 019
18 ALEXANDER CHARLES BECKMAN, and       )  BLOCK 0990)
   VALERIE LAU BECKMAN,                 )
19      a/k/a Valerie Lau,              )
                                        )
20          Defendants.                 )
                                        )
21 ─────────────────────────────────────)

22      NOTICE IS HEREBY GIVEN that an action has been commenced in the above-entitled Court

23 pursuant to an Indictment, a copy of which is attached hereto as Exhibit A, filed by the United States of

24 America on January 21, 2025, to secure a judicial forfeiture of real property and improvements located

25 at 3877-3879 Jackson Street, San Francisco, California 94118 (APN: Lot 019,  Block 0990), and further

26 described in Exhibit B, which is attached hereto.

27 ///

28
   Notice of Lis Pendens 3877-3879 Jackson Street, SF, CA 94118
   CR 25-0012 RFL
                                          1

1     The Indictment alleges that the said real property is subject to forfeiture pursuant to Title 18,

2   United States Code, Sections 981(a)(1)(C), 982(a)(1), and 982(a)(2) and Title 28, United States Code,

3   Section 2461(c) and Rule 32.2 of the Federal Rules and Criminal Procedure.

4     The owners of record to the said real property are Alexander Beckman, a single man,

5   and Valerie Lau, a single woman.

6   DATED: January 23, 2025                                    Respectfully submitted,

7                                                              PATRICK D. ROBBINS
                                                               Acting United States Attorney
8

9                                                                      /S/

10                                                             DANIEL PASTOR
                                                               GREGG W. LOWDER
11                                                             Assistant United States Attorneys

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Northern District of California and is a person of such age and discretion to be competent to serve papers. The undersigned further certifies that she caused a copy of

- Notice of Lis Pendens as to Real Property and Improvements located at 3877-3879 Jackson Street, San Francisco, California 94118

to be served this date via United States certified mail and first class mail delivery upon the person(s) below at the place(s) and address(es) which is the last known address(es):

Alexander Beckman                         Valerie Lau
3877-3879 Jackson Street,                 3877-3879 Jackson Street,
San Francisco, California 94118           San Francisco, California 94118

First Republic Bank                       Fidelity National Title Insurance Company
111 Pine Street                           601 California Street, Suite 1501
San Francisco, CA 94111                   San Francisco, CA 94108

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of January 2025, at San Francisco, California

_____/S/_____
ILSA WOLF
FSA Paralegal
Asset Forfeiture Unit

# Exhibit A

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 ℭ𝔬𝔲𝔯𝔱

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

ALEXANDER CHARLES BECKMAN, and
VALERIE LAU BECKMAN a/k/a Valerie Lau

DEFENDANT(S).

---

# INDICTMENT

18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud; 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud; 18 U.S.C. § 371 – Conspiracy to Commit Securities Fraud; 18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud; 18 U.S.C. § 1014 – False Statement to a Bank; 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft; 18 U.S.C. § 1512(c)(1) – Obstruction of Justice; 18 U.S.C. § 2 – Aiding and Abetting; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2) and 28 U.S.C. § 2461(c) – Forfeiture Allegation ✚

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this __21st__ day of

__January, 2025__

Julia Macias
Clerk

Bail, $ __Warrants (2)__

Hon. Peter H. Kang, U.S. Magistrate Judge

PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

```
┌─────────────────────────────────────────┐
│              FILED                        │
│                                           │
│           Jan 21 2025                     │
│                                           │
│           Mark B. Busby                   │
│    CLERK, U.S. DISTRICT COURT             │
│  NORTHERN DISTRICT OF CALIFORNIA          │
│          SAN FRANCISCO                    │
└─────────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:25-cr-00012 RFL |
| Plaintiff, | VIOLATIONS: |
| | 18 U.S.C. § 1343 – Wire Fraud; |
| v. | 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud; |
| ALEXANDER CHARLES BECKMAN, and VALERIE LAU BECKMAN, | 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud; |
| a/k/a Valerie Lau, | 18 U.S.C. § 371 – Conspiracy to Commit Securities Fraud; |
| | 18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud; |
| Defendants. | 18 U.S.C. § 1014 – False Statement to a Bank or Other Federally Insured Institution; |
| | 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; |
| | 18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft; |
| | 18 U.S.C. § 1512(c)(1) – Obstruction of Justice; |
| | 18 U.S.C. § 2 – Aiding and Abetting; |
| | 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2) and 28 U.S.C. § 2461(c) – Forfeiture Allegation |
| | SAN FRANCISCO VENUE |

INDICTMENT

<u>I N D I C T M E N T</u>

The Grand Jury charges:

<u>Introductory Allegations</u>

At all times relevant to this Indictment:

<u>Overview</u>

1.      From at least in or about September 2018 through in or about July 2024, defendant ALEXANDER CHARLES BECKMAN used his position as GameOn, Inc.'s Chief Executive Officer and one of its founders to defraud GameOn investors through a series of lies, half-truths, and misleading statements and representations about GameOn's business.  GameOn was a private business that offered a software program commonly known as a chatbot that claimed on its website to be "the industry leading enterprise-grade conversational AI platform, trusted by the world's leading brands in retail, sports, and media & entertainment."  Its customers included prominent American professional sports teams, associations, and leagues as well as leading brands in fashion and retail.  During the fraud scheme alleged in this Indictment, BECKMAN raised over $60 million from GameOn investors, and he raised a total of over $80 million since GameOn's 2014 founding.

2.      BECKMAN's fraud scheme was brazen and wide-ranging.  BECKMAN's statements to GameOn investors often described revenue that never existed, cash balances that were vastly inflated, and customer relationships that were not real and otherwise greatly exaggerated.  BECKMAN lied about his credentials, too, telling investors that his prior company was sold for far more than it actually was. To further the scheme, BECKMAN used the names of at least seven real people—including fake emails and signatures—without their permission and without lawful authority to distribute and share false and fraudulent GameOn financial and business information and documents with the intent to defraud GameOn investors and GameOn itself.  BECKMAN also fabricated two GameOn audit reports using the names, signatures, and trademarks of reputable accounting firms to validate GameOn financial statements that BECKMAN knew to be false and fraudulent and created and distributed over a dozen fake bank statements for GameOn's accounts as part of the scheme.  In addition, BECKMAN made false statements and promises to investors about how GameOn used and would use investor funds, diverting millions of dollars from investors and GameOn to pay for BECKMAN's personal expenses.

INDICTMENT                                        2

3.    Defendant VALERIE LAU BECKMAN, a/k/a Valerie Lau ("LAU"), was in a close personal relationship with BECKMAN for several years before marrying BECKMAN on a date known to the Grand Jury in October 2023. During the relevant period, LAU was an attorney who changed law firms multiples times before joining Venture Capital Firm 1 in or about September 2021, eventually becoming Venture Capital Firm 1's General Counsel. From at least in or about 2016 through in or about 2024, LAU worked on GameOn corporate and transactional matters.

4.    Since at least in or about April 2022, LAU conspired with BECKMAN and knowingly and intentionally participated in the schemes to defraud alleged in this Indictment. LAU received fake documents from BECKMAN and reviewed them before he sent them and caused them to be sent to members of GameOn's board of directors and GameOn investors. LAU knew BECKMAN created a fake audit report for GameOn in or about October 2023, and she nevertheless distributed that fake audit report to a GameOn investor's representative in March 2024 to induce further investment into GameOn and saw BECKMAN distribute fake audit reports to other investors for the same purpose. When GameOn's investors serving on its board of directors began to push BECKMAN for transparency regarding its corporate accounts, LAU furthered the scheme to defraud by personally and knowingly delivering a fake GameOn account statement—one that listed GameOn's balance at Financial Institution 1 as over $13 million when GameOn's true balance at Financial Institution 1 for that period was just $25.93—to a bank branch in San Francisco and asking a bank employee to print the fake statement and keep it in an envelope at the bank for BECKMAN to pick up later that day. Later that afternoon, BECKMAN went to the same branch location with a GameOn director who wanted to see an account statement directly from the bank and picked up the fake statement knowingly planted there by LAU. Both LAU and BECKMAN knew this statement contained materially inflated balance information. When LAU's employer, Venture Capital Firm 1, approached her in or about August 2024 regarding GameOn, LAU lied to Venture Capital Firm 1 about her work for GameOn and then attempted to delete hundreds of files relating to that GameOn work from Venture Capital Firm 1's records at a time when a grand jury investigation into GameOn was pending and reasonably foreseeable to LAU.

5.    Both BECKMAN and LAU used GameOn investor funds for their own personal benefit, including to make payments to BECKMAN's minor children's private school and to make payments at

INDICTMENT                                    3

the social club that served as their wedding venue and jewelry stores. BECKMAN and LAU also used GameOn investor funds to pay for luxury vehicles, personal property taxes, and private club memberships. Among the most significant examples though was when BECKMAN and LAU used approximately $4.2 million of GameOn investor funds in or about April 2022 to purchase a personal residence in San Francisco. BECKMAN and LAU then tried to obtain a loan to pay back GameOn some of the money they took out of GameOn's corporate account, and to obtain that loan from Financial Institution 4, LAU knowingly created fake GameOn board of director meeting minutes falsely stating that GameOn's board had authorized BECKMAN to take out a multi-million-dollar personal loan pursuant to his status as a GameOn founder. The fake meeting minutes that LAU sent BECKMAN included the name and electronic signature of Board Secretary 1, a partner at Law Firm 1, where LAU previously worked. Shortly after receiving the false and fraudulent minutes from LAU, BECKMAN sent those minutes, which he knew to be false, to Financial Institution 4 so that Financial Institution 4 could finalize BECKMAN and LAU's loan application.

Relevant Individuals and Entities

6.      BECKMAN and LAU resided in the Northern District of California.

7.      GameOn, also known as GameOn Technology, changed its name to ON Platform in or about October 2023, but the company continued to use the name GameOn in connection with investment contracts and corporate bank accounts into 2024. As a result, this Indictment uses the name GameOn to refer to the same company both before and after the October 2023 name change.

8.      Investor 1 was an investment firm based in San Francisco, California.

9.      Investor 2 was an investment firm based in New York, New York.

10.     Investor 3 was an investment firm based in San Francisco, California.

11.     Investor 4 was an investment firm based in New York, New York.

12.     Investor 5 was an individual based in the Northern District of California.

13.     Investor 6 was an investment firm based in the Northern District of California and elsewhere.

14.     Consultant 1, Contractor 1, and CFO 1 were real people who worked with and for GameOn.

INDICTMENT                                    4

15.    Board Secretary 1, who was a partner at Law Firm 1, and Board Secretary 2, who was a former partner at Law Firm 1, were real people and attorneys who served at different times as secretary for GameOn's board of director meetings.

16.    League 1 was one of the four major American professional sports leagues and was in a contractual relationship with GameOn through an entity that controlled League 1's media rights. League 1 Employee 1 was a real person who worked on matters relating to GameOn for League 1.

17.    Financial Institution 1, Financial Institution 2, Financial Institution 3, and Financial Institution 4 operated in the Northern District of California and elsewhere.

18.    Financial Advisor 1 and Financial Advisor 2 were real people who worked for Financial Institution 1 in the Northern District of California.

19.    Bank Employee 1 was an employee of Financial Institution 2 in the Northern District of California.

<u>GameOn's Business</u>

20.    During the relevant period, GameOn was a private company with its principal place of business in San Francisco, California. GameOn opened and maintained corporate bank accounts at Financial Institution 1, Financial Institution 3, and Financial Institution 4 in the Northern District of California.

21.    GameOn offered its customers a software program claiming artificial intelligence or AI functionality that mimicked human conversation and interaction, commonly known as a chatbot or simply "chat." GameOn's chatbot responded to natural language inquiries and other inputs, allowing its customers to use the chatbot as a tool to engage with their own fans, customers, consumers, and other members of the public.

22.    GameOn developed business relationships with multiple major American professional sports leagues, associations, and teams that used GameOn's chatbot. GameOn had contractual and business relationships with multiple major American professional sports leagues, including League 1. GameOn also had contractual and business relationships with multiple major American professional sports teams and organizations within these major American professional sports leagues as well as with other teams, companies, entities, and organizations in the sports and entertainment industry. Some of

INDICTMENT                                5

1  these contracts, including GameOn's contracts with League 1, were formally between GameOn and a

2  firm that controlled, or was controlled by, the sports league, association, or team, or that controlled

3  respective media rights for that league, association, or team.  GameOn referred to its relationship as one

4  with League 1, and this Indictment does the same.  GameOn also had contractual and business

5  relationships with brands in other industries, including a luxury fashion business located in Milan, Italy.

6          23.      GameOn's business relationships were not all the same.  In some cases, GameOn initially

7  offered its chatbot as a free pilot without any contract between GameOn and the customer.  Some

8  customers had contracts that provided for the possibility of revenue sharing with GameOn only if certain

9  conditions were met.  Revenue sharing did not actually occur with nearly all GameOn customers.  Other

10 customers had contracts that called for the customers to pay flat fees to GameOn on a periodic basis or

11 for a set term while the customer used GameOn's chatbot.  In most cases, customers paid GameOn fees

12 of no more than $3,000 per month or an equivalent rate over a different period.  In some cases, GameOn

13 promised to pay select prominent customers large annual fees, and GameOn had rights to revenue

14 sharing with these customers only if certain conditions were satisfied.  For example, GameOn paid

15 League 1 hundreds of thousands of dollars and received no payments and no revenue sharing from

16 League 1 in return.

17         24.      As a result of this business model, GameOn had limited revenues from sales and any

18 other sources.  GameOn's revenues did not exceed $1,000,000 in any of the years from its founding in

19 2014 to the present.  In most years, GameOn's annual revenue was materially less than $500,000.

20         25.      From in or about 2014 through in or about 2024, GameOn used independent contractors

21 from Company 1 to work on GameOn financial matters.  In or about October 2023, CFO 1 joined

22 GameOn as a part-time or fractional chief financial officer to assist GameOn with its financial

23 management.  BECKMAN did not freely share information with other GameOn officers, employees,

24 and contractors, including contractors from Company 1 and CFO 1.  Instead, BECKMAN regularly

25 provided false and otherwise incomplete information about GameOn's finances and his own financial

26 management.

27         26.      Given its limited revenues, GameOn funded its operations in part through outside

28 investment.  GameOn raised a total of over $80 million going back to its founding in 2014, with over

INDICTMENT                                         6

$60 million of that total coming to GameOn from investors between in or about 2020 through in or about June 2024. These investments were pursuant to a variety of investment vehicles, including convertible notes, a Series B Preferred Stock offering from in or about September 2021 through in or about December 2022, and Simple Agreements for Future Equity or SAFEs from in or about May 2023 through in or about June 2024. SAFEs are a type of investment contract that gives investors a right to later receive stock in a company. GameOn's SAFE included a $400 million post-money valuation for GameOn. Investors in GameOn's Series B Preferred Stock offering between in or about September 2021 and in or about December 2022 were issued shares of GameOn stock, and those shares constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5. The Simple Agreements for Future Equity, or SAFEs, purchased by GameOn investors between in or about May 2023 and in or about June 2024 were investment contracts and constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5.

27.     In addition to money raised from investors, GameOn regularly engaged in large financial transactions with individuals, including BECKMAN, LAU, and others known and unknown to the Grand Jury, that gave GameOn at least temporary access to funds from those individuals. GameOn missed and was late to pay payroll for its own employees and to pay other bills on multiple occasions, and money sometimes was transferred to GameOn when the company needed money for expenses like payroll. At times, money flowed from GameOn back to these individuals after new funds from GameOn investors arrived. Personal credit cards were also used at times to cover GameOn expenses, and then those credit card balances were paid, including portions of the balances that involved personal expenses unrelated to GameOn, using GameOn investor funds after they arrived. The following examples demonstrate the pattern of money movement:

a.     On or about May 4, 2021, a bank account controlled by LAU used the Fedwire system to transfer $86,250 to GameOn's corporate bank account with Financial Institution 3, which had a negative balance before this transfer from LAU. On or about May 21, 2021, Investor 1 used Fedwire to send approximately $2.5 million to GameOn's account with Financial Institution 3 pursuant to an investment deal in

which LAU served as GameOn's outside counsel while she was an attorney at Law Firm 2. On or about May 24, 2021, BECKMAN signed a check from GameOn's account with Financial Institution 3 payable to LAU in the amount of $111,250 with the memo line on the check stating "Reimbursement." On or about May 25, 2021, the $111,250 check was deposited in a bank account controlled by LAU.

b. On or about September 13, 2021, a bank account controlled by LAU used the Fedwire system to transfer $155,000 to GameOn's corporate bank account with Financial Institution 3, which had a negative balance before this transfer from LAU. On or about September 14, 2021, GameOn's account with Financial Institution 3 received over $5 million from an investor based in Asia. On or about September 16, 2021, BECKMAN signed a check for $185,000 payable to LAU from GameOn's account with Financial Institution 3 with the memo line on the check stating "Repayment." On or about September 16, 2021, the $185,000 check was deposited in a bank account controlled by LAU.

c. In or about March 2024, one of LAU's personal credit cards incurred expenses relating to GameOn. In or about May 2024, new investor funds went to GameOn's account with Financial Institution 1. In or about May 2024, after knowingly causing money to be transferred between GameOn accounts, BECKMAN knowingly caused approximately $270,000 of GameOn investor money to pay one of LAU's outstanding credit card bills, which included GameOn expenses but also personal expenses unrelated to GameOn's business.

28.    From at least in or about September 2018 through his resignation from GameOn in or about July 2024, BECKMAN served as the primary point of contact for new and existing GameOn investors and its board of directors, and BECKMAN controlled and understood the financial information for GameOn that he shared with investors. BECKMAN and others had signatory authority over GameOn's accounts with Financial Institution 1, Financial Institution 3, and Financial Institution 4. LAU assisted BECKMAN by, among other things, sharing financial information, populating and providing access to GameOn's online data room containing investment materials, answering investor

INDICTMENT    8

1  questions, sharing wire instructions, and finalizing investment contracts between GameOn and investors.

2  LAU also assisted BECKMAN by creating and modifying financial spreadsheets to share with investors

3  and in causing fake documents to be created. LAU was often the only person associated with GameOn

4  other than BECKMAN communicating with and copied on communications with GameOn investors

5  prior to their investments.

6                    Defendants' Scheme to Defraud Investors

7        29.    Beginning on a date unknown, but no later than in or about September 2018, and

8  continuing through in or about July 2024, BECKMAN knowingly devised, intended to devise,

9  participated in, and engaged in a scheme, plan, and artifice to defraud GameOn investors as to a material

10  matter, and to obtain money and property by means of materially false and fraudulent pretenses,

11  representations, and promises, and by omission and concealment of material facts with a duty to

12  disclose.

13        30.    Beginning on a date unknown, but no later than in or about April 2022 and continuing

14  through in or about July 2024, LAU knowingly joined in a conspiracy with BECKMAN to defraud

15  GameOn investors and also knowingly devised, intended to devise, participated in, and engaged in a

16  scheme, plan, and artifice to defraud GameOn investors as to a material matter, and to obtain money and

17  property by means of materially false and fraudulent pretenses, representations, and promises, and by

18  omission and concealment of material facts with a duty to disclose.

19        31.    BECKMAN and LAU knowingly and intentionally made and caused to be made

20  materially false, fraudulent, and misleading statements to GameOn investors about, among other things,

21  GameOn's revenues, sales, profits, cash balances, customers, use of investor funds, and other aspects of

22  GameOn's business to induce investment in GameOn.

23        32.    When pushed for additional support for their fraudulent claims, BECKMAN and LAU

24  knowingly and intentionally made and caused to be made materially false, fraudulent, and misleading

25  statements and representations through false and fraudulent documents, false and fraudulent email

26  addresses using the names of real people, and false and fraudulent email correspondence.

27        33.    As part of the scheme to defraud, BECKMAN and LAU knowingly and intentionally

28  made materially false, fraudulent, and misleading statements to investors and failed to disclose material

INDICTMENT                              9

1    facts, using the following means and methods, among others: (1) materially false and misleading written

2    and verbal communications, including in emails and investment materials available in an online data

3    room; (2) materially false and misleading financial statements, models, and other information; (3)

4    materially false and misleading statements and representations in investment contracts, notes, and

5    agreements; (4) the impersonation of real individuals and use of false and fraudulent email addresses

6    and communications to create and distribute materially false and fraudulent GameOn financial and

7    business information; (5) materially false and misleading audit reports, board meeting minutes, bank and

8    investment account statements, invoices, diligence memos, and other documents; (6) communications

9    and processes that siloed information at GameOn and provided materially false and misleading

10   information to GameOn directors, officers, employees, contractors, and customers; and (7) the use of

11   significant amounts of GameOn and investor funds for BECKMAN and LAU's personal benefit without

12   disclosing that use to GameOn's investors, shareholders, and board of directors with a duty to disclose.

13       34.    To perpetuate the scheme, BECKMAN and LAU knowingly and intentionally distributed

14   and caused to be distributed financial and business information about GameOn that they knew to be

15   materially false and fraudulent to new potential investors and also to certain investors and investors'

16   representatives serving on GameOn's board of directors, investors and investor representatives

17   observing GameOn's board of director meetings, and other individuals attending GameOn's board

18   meetings. The materially false and fraudulent statements and representations to potential and existing

19   investors were designed and intended to induce new investment into GameOn. The materially false and

20   fraudulent statements and representations to existing investors were also designed and intended to lull

21   existing investors, including Investor 1, Investor 2, Investor 3, Investor 4, Investor 5, Investor 6, and

22   others known and unknown to the Grand Jury, into a false sense of security and to postpone any

23   investigation into BECKMAN and LAU's scheme to defraud. These continued lies allowed

24   BECKMAN and LAU to continue to raise money for GameOn through their scheme to defraud from

25   other existing and new investors. BECKMAN and LAU also designed and perpetrated their scheme

26   understanding that certain major existing investors were a source of additional potential investment in

27   future fundraising rounds that they would go back to later to ask for additional investments. In fact,

28   existing investors that received periodic financial updates after their initial investments often

INDICTMENT                                        10

1 participated in subsequent GameOn fundraising rounds, including Investor 1, Investor 2, Investor 4,

2 Investor 5, Investor 6, and other investors known and unknown to the Grand Jury.

3      35.   As further described in this Indictment, after receiving materially false, fraudulent, and

4 misleading statements and representations from BECKMAN and LAU regarding GameOn's business,

5 Investor 1, Investor 2, Investor 3, Investor 4, Investor 5, and other GameOn investors known and

6 unknown to the Grand Jury gave money to GameOn using electronic wire transfers that traveled

7 between one state and another state.  Specific wire transfers are described in paragraph 102 and

8 incorporated here by reference.  BECKMAN and LAU also knowingly transmitted and caused to be

9 transmitted email and other electronic communications with GameOn investors and their representatives

10 that originated from individuals in the Northern District of California and traveled through servers

11 outside California and in foreign countries and were received by individuals outside California and in

12 other countries.

13      36.   Parts of BECKMAN and LAU's scheme to defraud and examples are described below.

14     A.  <u>Materially False, Fraudulent, and Misleading Statements and Representations About</u>

15        <u>GameOn's Revenue, Cash, Customers, and Other Financial Matters</u>

16      37.   As part of the scheme, BECKMAN and LAU knowingly and intentionally made and

17 caused to be made materially false, fraudulent, and misleading statements and representations to

18 investors regarding GameOn's historical financial performance and its projected future performance.

19      38.   Beginning on a date unknown but no later than September 2018 and continuing through

20 in or about June 2024, BECKMAN knowingly and intentionally created and caused the creation of

21 materially false and fraudulent unaudited financial statements for GameOn.  These unaudited financial

22 statements purported to show GameOn's profit and loss statements with, among other things, GameOn

23 revenues (including revenues from sales and any other sources), profits, and net income on quarterly

24 bases.  These financial statements also included GameOn's balance sheets which purported to show,

25 among other things, GameOn's balances of cash and cash equivalents and accounts receivable as of

26 specific dates in time.  BECKMAN knew that these unaudited financial statements materially inflated

27 and changed important financial information to make GameOn appear more successful than it actually

28 was and more attractive to investors.  LAU assisted BECKMAN with creating and manipulating these

INDICTMENT             11

1    financial statements going back at least to October 2019.

2    39.    During the scheme, BECKMAN and LAU distributed these materially false and
3    fraudulent unaudited GameOn financial statements directly to potential and existing investors via email
4    and made them available to investors through GameOn's online data room knowing the financial
5    statements were materially false, fraudulent, and misleading and intending to defraud GameOn
6    investors.

7    40.    GameOn investors were led to believe that these financial statements were accurate and
8    reliable. For example, the Series B Preferred Stock Purchase Agreement, signed by BECKMAN on
9    behalf of GameOn, and also by representatives of Investor 1, Investor 2, Investor 4, and Investor 6, and
10   by Investor 5 and others as purchasers under the agreement, contained false and misleading
11   representations regarding GameOn's business, financial condition, financial statements, and liabilities.
12   Among other things, the Series B Preferred Stock Purchase Agreement represented that GameOn's
13   unaudited financial statements as of June 30, 2021, and for the fiscal year ending December 31, 2020
14   "fairly present in all material respects the financial condition and operating results of the Company . . .
15   subject in the case of the unaudited Financial Statements to normal year-end audit adjustments."

16   41.    The following are examples in which BECKMAN and LAU knowingly and intentionally
17   sent and caused to be sent materially false, fraudulent, and misleading unaudited financial statements at
18   a time when an investor was considering investing in GameOn:

19       a.  On or about February 24, 2020, BECKMAN emailed an Investor 4 representative and
20           attached a spreadsheet containing materially false and fraudulent unaudited financial
21           statements for GameOn through December 2019 and a materially false and fraudulent
22           balance sheet for GameOn through September 2019. According to the spreadsheet's
23           metadata, LAU is the author of the spreadsheet, and it was created on or about
24           October 14, 2019. BECKMAN knew this spreadsheet contained materially false and
25           fraudulent representations regarding GameOn's cash balances, revenue (including
26           sales), and other measurements of financial performance and financial health. At the
27           time of this February 24, 2020 email exchange with BECKMAN, Investor 4 was
28           considering investing in GameOn and did so through an entity formed for the purpose

INDICTMENT                                    12

of investing in GameOn securities in or about June 2020 pursuant to a convertible promissory note in the amount of $500,000. Following this initial investment, Investor 4 continued to receive false and fraudulent information about GameOn and made subsequent investments of $500,000 in or about January 2021 and $1,000,000 in or about October 2022.

b. On or about May 18, 2021, two weeks after sending GameOn $86,250 from her personal bank account as set for in paragraph 27.a, LAU sent an email to Investor 1's Chief Financial Officer copying into the body of the email "April financials" that she claimed she had pulled herself. LAU sent this email from her email account with Law Firm 2, where she worked at the time, and represented GameOn as outside counsel in the negotiations with Investor 1. LAU's email included a table with materially false and fraudulent financial information for GameOn from April 2021, including over $4 million in total sales and approximately $1.9 million in gross profit. In reality, GameOn's revenues figures (including sales) did not exceed $1 million in all of 2021. Investor 1 was at the time considering investing in GameOn pursuant to a convertible promissory note and did send GameOn approximately $2.5 million from several funds managed by Investor 1 three days later on May 21, 2021.

c. On or about May 19, 2021, BECKMAN provided Investor 1's CFO another version of the unaudited quarterly financial statement that contained materially false and fraudulent revenue, cash, and other financial information. In addition to false information about revenue and profits like the information that LAU sent to Investor 1 on or about May 18, 2021, BECKMAN's financial spreadsheet stated that as of May 15, 2021, GameOn's account with Financial Institution 3 had a balance of approximately $5.96 million and that GameOn had approximately $2.89 million in funds with Financial Institution 1. In reality, BECKMAN knew these balances were materially inflated. In fact, GameOn's account with Financial Institution 3 had a negative balance as of May 15, 2021, and its account with Financial Institution 1 had less than approximately $2,350 as of May 15, 2021.

INDICTMENT                                    13

d.  On or about September 21, 2021, LAU, using her email address at Law Firm 2, sent Investor 1's Chief Financial Officer a copy of GameOn's unaudited quarterly financial statement updated through June 2021. At the time, Investor 1 was considering investing in GameOn's Series B Preferred Stock Offering, and LAU, while an attorney at Law Firm 2, represented GameOn in those negotiations with Investor 1. Among other false and fraudulent statements, this spreadsheet described over $6 million in total sales for GameOn's second quarter in 2021 and over $4 million in gross profits for this same period. The balance sheet also materially overstated GameOn's balances of cash and cash equivalents and accounts receivable. After receiving this and other false and fraudulent information about GameOn from BECKMAN and LAU, in or about November 2021, Investor 1 made additional investments in GameOn pursuant to the Series B Preferred Stock Offering from three funds that Investor 1 managed in the total amount of approximately $3.2 million.

e.  On or about November 23, 2021, BECKMAN sent an email to Investor 2 partners, copying LAU, and attaching GameOn's unaudited financial statement through the third quarter of 2021 as well as other false and fraudulent financial and customer documents. At the time, Investor 2 was considering investing in GameOn's Series B Preferred Stock Offering. For example, among other false and fraudulent information in this version of the quarterly financial statements, the balance sheet represented that GameOn had approximately $17.8 million as of September 30, 2021, in a specific account with Financial Institution 3. BECKMAN knew that representation and others in this financial statement, including statements regarding revenue and profits, were materially false. In fact, GameOn had approximately $340,000 in that specific Financial Institution 3 account and approximately $5.1 million in another account with Financial Institution 3 as of September 30, 2021. The balance sheet also represented that GameOn had approximately $3.9 million in funds with Financial Institution 1, which BECKMAN knew to be materially false. In reality, GameOn had approximately $2,350 in its Financial Institution 1 account as of September 30, 2021.

INDICTMENT                                    14

After receiving this and other false and fraudulent information about GameOn, in or about January 2022, Investor 2 invested $2.25 million in GameOn pursuant to the Series B Preferred Stock Offering.

f.  On or about June 8, 2023, BECKMAN emailed an Investor 3 partner a copy of GameOn's unaudited financial statements through the first quarter of 2023. LAU was the only other person copied on this email. As with other instances in which BECKMAN and LAU sent unaudited financial statements to potential and existing investors, this version contained materially false and fraudulent financial information relating to GameOn. Among other things, this version of the financial statement falsely stated that GameOn had approximately $68.6 million in total sales for all of 2022, approximately $54.1 million in gross profit for all of 2022, approximately $25.7 million in funds with Financial Institution 1 as of March 31, 2023, and approximately $24.3 million in accounts receivable as of March 31, 2023. As noted above, BECKMAN knew that GameOn did not have revenue, let alone gross profits, over $1 million in any year since its founding, knew GameOn had materially less in accounts receivable, and also knew that its Financial Institution 1 account did not have anywhere close to $25 million in it. In truth, as of March 31, 2023, GameOn's Financial Institution 1 account had a balance of approximately $590,000. After receiving this and other false and fraudulent information about GameOn, in or about July 2023, Investor 3 used two funds that it managed to invest approximately $3 million in GameOn pursuant to the SAFE Offering.

g.  On or about November 1, 2023, BECKMAN emailed partners from Investor 2 who were considering an additional investment in GameOn's SAFE Offering. BECKMAN's email attached a version of GameOn's quarterly financials, which stated that GameOn had approximately $72.4 million in total sales for January through September 2023. The spreadsheet also stated GameOn had approximately $56.8 million in gross profits for this same period. BECKMAN knew these figures were materially overstated, with neither GameOn's actual revenue (including sales)

nor its gross profits exceeding $1 million for all of 2023. BECKMAN also knew the balance sheet was materially false, fraudulent, and misleading by claiming that GameOn's account balance with Financial Institution 4 was approximately $14.1 million and its balance with Financial Institution 1 was approximately $24.9 million as of September 30, 2023. In reality, as of September 30, 2023, GameOn's account balance with Financial Institution 4 was approximately $5.3 million, and GameOn's balance with Financial Institution 1 was $0. Investor 2 invested $100,000 in or about January 2024 pursuant to GameOn's SAFE Offering.

42.    BECKMAN and LAU's scheme involved other verbal and written statements in which BECKMAN and LAU knowingly and intentionally gave GameOn investors materially false, fraudulent, and misleading information about GameOn's financial performance and projections, including knowing and intentional materially false, fraudulent, and misleading statements and representations to new and existing investors about how GameOn made its money and misleading statements about revenue sharing.

43.    The scheme involved BECKMAN and LAU knowingly and intentionally making materially false, fraudulent, and misleading statements and representations to investors, both express and implied, that GameOn was presently a financially strong and stable company, with large growing revenues, projected growth, significant reserves of cash and cash equivalents, and an extended runway to continue operations. In truth, BECKMAN and LAU knew that GameOn depended on new investor funds to operate, burned through its funds, received overdraft notices from banks, was delinquent in paying certain customers, and often was on the brink of not having enough money in the bank to operate and make payroll. BECKMAN and LAU knew that GameOn was late to pay payroll on multiple occasions and used individual bank accounts and credit cards to pay their employees.

44.    In addition, BECKMAN knowingly and intentionally made and caused to be made materially false, fraudulent, and misleading statements and representations about GameOn's business relationships and customers to GameOn investors. In some instances, BECKMAN made statements and representations to GameOn investors characterizing certain entities as GameOn customers when BECKMAN knew those entities were never GameOn customers at all. In other instances, BECKMAN

1  made statements and provided documents to investors that exaggerated GameOn's customer

2  relationships by describing specific revenue and payments from customers to GameOn that did not

3  actually exist.  BECKMAN further misled GameOn investors by describing certain customer

4  relationships as producing revenue for GameOn when in fact BECKMAN knew that GameOn owed

5  those customers money and was regularly late in paying them.

6      45.    For example, in or about June 2023, BECKMAN emailed an Investor 3 partner and

7  attached a breakdown of GameOn revenue by customer that included significantly overstated revenue

8  figures for particular GameOn customers.  The breakdown document also included companies like

9  Beverage Company 1 that BECKMAN knew was not a GameOn customer responsible for any GameOn

10 revenue. Later that month, the Investor 3 partner asked BECKMAN questions about specific customers

11 and specific revenue from those customers.  In response, BECKMAN provided false and fraudulent

12 information about GameOn's relationship with League 1 and others.  When the Investor 3 partner asked

13 BECKMAN to send a redacted bank statement supporting BECKMAN's claims regarding GameOn's

14 revenue from League 1 as reflected in the aforementioned breakdown document, BECKMAN emailed

15 the Investor 3 partner, copying LAU and other Investor 3 representatives, and attached a fake Financial

16 Institution 3 statement for GameOn's account there.  The fake bank statement that BECKMAN sent

17 included a wire transfer of $3.28 million from an entity associated with League 1, but in truth,

18 BECKMAN knew that bank statement was materially false, fraudulent, and misleading and that the

19 $3.28 million transaction relating to League 1 never happened.

20      B.  Materially False and Fraudulent Statements, Representations, and Promises About How
          Investors' Money Would Be Used

21

22      46.    It was part of the scheme that BECKMAN and LAU knowingly and intentionally made

23 and caused to be made materially false and fraudulent statements, representations, and promises

24 regarding how GameOn, BECKMAN, and LAU would use investor funds.

25      47.    GameOn investors understood that their investments would go to GameOn's business,

26 not personal expenses associated with BECKMAN, LAU, and others, but BECKMAN and LAU

27 knowingly and intentionally diverted fraudulently obtained investor funds for their own use and benefit

28 throughout the scheme to defraud.

INDICTMENT                               17

48.    BECKMAN also affirmatively told some investors that GameOn would use new investment for specific purposes associated with growing GameOn's team, expanding into new business verticals beyond sports, and making acquisitions.

49.    Despite these statements, representations, and promises, BECKMAN and LAU regularly used investor funds for personal expenses. Among other things, BECKMAN and LAU used GameOn funds from investors to pay hundreds of thousands of dollars to BECKMAN's minor children's school, hundreds of thousands of dollars to a social club where BECKMAN and LAU hosted their wedding in or about November 2023, hundreds of thousands of dollars in payments to jewelry and luxury retail businesses, hundreds of thousands of dollars on luxury vehicles, and over $100,000 in personal property taxes. BECKMAN and LAU also used new investor funds to pay personal credit card balances that were used in part to pay for GameOn expenses and in part to pay for BECKMAN and LAU's personal expenses.

50.    In addition, BECKMAN and LAU knowingly and intentionally used GameOn investor funds to purchase San Francisco residences on ███ Street and ███ Street. The full addresses of the ███ Street residences are listed in the forfeiture allegation of this Indictment and are incorporated by reference here. In or about December 2020, BECKMAN and LAU used approximately $360,000 in GameOn investor funds to put toward the purchase of the ███ Street residence. In or about April 2022, BECKMAN and LAU used approximately $4.2 million in investor funds to purchase the ███ Street residences. As part of their purchase of the ███ Street residences, BECKMAN and LAU knowingly caused wire transfers from GameOn's account with Financial Institution 4 to BECKMAN and LAU's joint personal bank account at Financial Institution 4 in the amount of $4,100,000 and $100,000, both occurring on or about April 18, 2022. Before transferring this money from GameOn's corporate account, BECKMAN and LAU's joint personal account with Financial Institution 4 had a balance of approximately $35,000. On or about April 18, 2022, BECKMAN and LAU caused a wire transfer of $127,500 from their joint personal account at Financial Institution 4 to the title company for the purchase of the ███ Street residences, and on or about April 26, 2022, BECKMAN and LAU knowingly caused a wire transfer of $4,131,009.09 from their joint personal account at Financial Institution 4, knowing that the money was proceeds of the scheme to defraud GameOn investors, for the

INDICTMENT                          18

remainder of the purchase of the ███ Street residences.

C. Impersonation of Real People Affiliated with GameOn to Share False and Fraudulent Information Regarding GameOn's Finances and Business

51.     As part of the scheme, BECKMAN knowingly and intentionally used names and initials of real people affiliated with GameOn and fake GameOn email accounts in their names without their permission and without lawful authority to make materially false, fraudulent, and misleading statements and representations about GameOn business and financial matters to GameOn investors and GameOn's board of directors.

52.     For example, in or about October and November 2019, BECKMAN knowingly and intentionally used the name and initials of Consultant 1, a real person who consulted for GameOn in or about 2019, and a fake GameOn email account using Consultant 1's name and initials to send materially false and fraudulent financial information about GameOn to potential GameOn investors in Asia. BECKMAN also used the fake Consultant 1 email account to vouch for materially false and fraudulent financial statements for GameOn that BECKMAN knew had been manipulated and altered by BECKMAN and LAU in or about October 2019.

53.     In another example from in or about February 2023 and continuing through at least in or about May 2024, BECKMAN used the name and initials of Contractor 1, a real person working on GameOn financial matters for Company 1, and fake GameOn email accounts using Contractor 1's name and initials to send materially false and fraudulent financial information and documents about GameOn to investors, including representatives of Investor 1, Investor 6, and others serving on GameOn's board of directors. In total, BECKMAN knowingly used the fake Contractor 1 email account to distribute multiple false and fraudulent versions of GameOn's unaudited financial statements, at least nine false and fraudulent bank statements, and one false and fraudulent audit report. BECKMAN knew that the false and fraudulent bank statements distributed through the fake Contractor 1 email account misrepresented specific transactions between GameOn and its customers and other third parties to make GameOn's revenue streams appear more significant than they were. False and fraudulent bank statements also misrepresented the cash available in GameOn's accounts. In July 2023, BECKMAN sent a series of bank statements that he knew to be materially false and fraudulent to LAU before

INDICTMENT                                          19

1  causing those bank statements to be sent from the fake Contractor 1 email accounts back to BECKMAN,

2  which BECKMAN then forwarded to representatives of Investor 6 along with false and fraudulent

3  correspondence impersonating Contractor 1. BECKMAN's objective was to give false and fraudulent

4  financial information about GameOn the appearance of coming from a person who approved and

5  validated the financial information other than BECKMAN.

6       54.    In a third example occurring between on or about October 23, 2023, and continuing

7  through in or about April 2024, BECKMAN used the name and initials of CFO 1, a real person who

8  served during that time as GameOn's part-time or fractional CFO, and an email address using CFO 1's

9  name and initials to distribute materially false and fraudulent financial information to Investor 1 and an

10 Investor 1 partner serving on GameOn's board of directors. Around this time, BECKMAN and LAU

11 were working to raise new money for GameOn through its SAFE Offering. On or about November 9,

12 2023, BECKMAN knowingly and intentionally caused the fake CFO 1 email account to send Investor 1

13 GameOn's unaudited quarterly financial report, knowing it contained false and fraudulent information

14 relating to GameOn's finances, forecasts, and business. BECKMAN deleted the fake CFO 1 email

15 account in or about April 2024.

16      55.    BECKMAN created additional fake emails and email correspondence in and using the

17 names of real people throughout the scheme without their knowledge and without lawful authority.

18      D.  Creating and Distributing Materially False, Fraudulent, and Misleading Audit Reports
            Supporting GameOn Financial Information
19

20      56.    As part of the scheme, BECKMAN and LAU knowingly and intentionally created and

21 distributed, and caused the creation and distribution of, materially false, fraudulent, and misleading audit

22 reports and other false, fraudulent, and misleading statements and representations about auditors who

23 purported to support, validate, and certify GameOn's financial information and statements. As further

24 described below, in some instances, BECKMAN and LAU sent these audit reports and statements and

25 representations regarding auditors to GameOn's board of directors, board observers, and investors in

26 furtherance of the scheme to defraud.

27      57.    On or about June 20, 2022, LAU, who was an attorney working for Venture Capital Firm

28 1 at the time, sent BECKMAN a copy of a genuine audited financial statement for a company with no

INDICTMENT                           20

connection to GameOn that was in fact prepared by Professional Services Company 1 ("Genuine Professional Services Company 1 Audit Report"). The Genuine Professional Services Company 1 Audit Report that LAU sent to BECKMAN included a watermark bearing an email address associated with Venture Capital Firm 1. LAU had access to the Genuine Professional Services Company 1 Audit Report through her work at Venture Capital Firm 1.

58.    On or about June 21, 2022, BECKMAN sent a fake audit report purporting to be written by Professional Services Company 1 for GameOn's 2021 financial statements to GameOn's board of directors and board observers, including representatives of Investor 1, Investor 4, and Investor 6 (the "Fake Professional Services Company 1 Audit Report"). BECKMAN knew that Professional Services Company 1 did not author the Fake Professional Services Company 1 Audit Report, and BECKMAN knew that Professional Services Company 1 did not perform any audit services for GameOn. The Fake Professional Services Company 1 Audit Report was similar in style, form, structure, and substance to the Genuine Professional Services Company 1 Audit Report that LAU sent to BECKMAN the day before. The Fake Professional Services Company 1 Audit Report included Professional Services Company 1's name, logo, and signature and falsely claimed to be an audit performed by Professional Services Company 1 of GameOn's 2021 financial statements with an unqualified opinion regarding those financial statements. The GameOn financial figures contained in the Fake Professional Services Company 1 Audit Report were also materially false, fraudulent, and misleading. Among other things, BECKMAN knew that the Fake Professional Services Company 1 Audit Report materially overstated GameOn's revenue and sales figures, bank account balances, accounts receivable, and gross profits.

59.    Beginning in or about July 2023, BECKMAN and LAU knowingly and intentionally made materially false and fraudulent statements and representations to, and knowingly and intentionally shared materially false and fraudulent information with, GameOn's board of directors and board observers, including representatives of Investor 1, Investor 4, and Investor 6, regarding GameOn's work with Professional Services Company 2, a Big Four accounting firm. On or about July 27, 2023, LAU sent BECKMAN a genuine audit report for another company's financial statements performed by Professional Services Company 2, which LAU had access to because her employer, Venture Capital Firm 1, had considered investing in the company that was the subject of the genuine audit report (the

INDICTMENT                          21

"Genuine Professional Services Company 2 Audit Report"). On or about July 28, 2023, BECKMAN lied to GameOn's board of directors and board observers in email correspondence by telling them, "We have started the process of auditing our 2022 financials. We used [Professional Services Company 1] for 2021 and are using [Professional Services Company 2] for last year." LAU knowingly and intentionally assisted BECKMAN in drafting this false and fraudulent email. Later, at a July 2023 board meeting, BECKMAN knowingly and intentionally repeated false information relating to audits of GameOn's financial statements by telling the GameOn board and its observers that GameOn was using Professional Services Company 2 to audit its 2022 financial statements. In fact, BECKMAN and LAU knew that Professional Services Company 2 was not performing any audit services for GameOn at this time.

60.    Beginning in or about September 2023 and continuing through in or about November 2023, LAU met and corresponded with Professional Services Company 2 representatives regarding the possibility of Professional Services Company 2 performing audit services for GameOn. LAU arranged for a meeting in or about early October 2023 that was attended by BECKMAN, LAU, a Professional Services Company 2 audit partner, and another Professional Services Company 2 employee. BECKMAN and LAU knew that Professional Services Company 2 never agreed to perform audit services for GameOn during their correspondence and meetings.

61.    Rather than actually engage and pay Professional Services Company 2 to audit GameOn, BECKMAN created a fake audit report using Professional Services Company 2's name. On or about October 19, 2023, BECKMAN sent LAU via email an audit report for GameOn's 2022 financial statements purportedly authored by Professional Services Company 2. BECKMAN created this fake audit report by modifying the Genuine Professional Services Company 2 Audit Report that LAU had sent BECKMAN by email on or about July 27, 2023, as described in paragraph 59. On or about October 23, 2023, BECKMAN sent LAU an email with the subject line "attached please take look," attaching a revised version of the audit report for GameOn's 2022 financial statements purportedly authored by Professional Services Company 2 along with other GameOn board materials containing false and fraudulent information (the "Fake Professional Services Company 2 Audit Report"). At the time of the emails described in this paragraph, BECKMAN and LAU knew that Professional Services Company 2

INDICTMENT                    22

1    had not actually authored the Fake Professional Services Company 2 Audit Report, and BECKMAN and

2    LAU also knew that Professional Services Company 2 had not begun performing audit services for

3    GameOn. The Fake Professional Services Company 2 Audit Report included Professional Services

4    Company 2's name, logo, and signature, and it was similar in style, form, structure, and substance to the

5    Genuine Professional Services Company 2 Audit Report. The Fake Professional Services Company 2

6    Audit Report materially overstated key financial figures for GameOn as of December 31, 2022,

7    including, for example, GameOn's gross sales and revenues, income, balances of cash and cash

8    equivalents, and accounts receivable, and provided an unqualified opinion supporting those figures. The

9    Fake Professional Services Company 2 Audit Report stated that GameOn's Gross Sales for the Year

10    Ended December 31, 2022, were approximately $68.6 million, when in reality, BECKMAN and LAU

11    knew that GameOn's gross sales or revenue for this period was less than $1,000,000.

12         62.    Later that morning, on or about October 23, 2023, and before BECKMAN distributed the

13    Fake Professional Services Company 2 Audit Report to anyone else, BECKMAN emailed LAU again,

14    this time attaching the Genuine Professional Services Company 2 Audit Report that LAU had sent him

15    originally on or about July 27, 2023.

16         63.    Later in the morning, on or about October 23, 2023, after the exchanges with LAU

17    described in paragraphs 61 and 62, BECKMAN emailed the Fake Professional Services Company 2

18    Audit Report to GameOn's board of directors and board observers, including representatives of Investor

19    1, Investor 4, Investor 6, and other investors and investor representatives, including a representative of at

20    least one investor that invested approximately $3.1 million in or about May 2024 after receiving the

21    Fake Professional Services Company 2 Audit Report. BECKMAN also included Board Secretary 2 on

22    the email correspondence with GameOn's board and blind copied LAU and his own personal email on

23    the correspondence. This email originated from, and was received by individuals in, the Northern

24    District of California and also was received by individuals outside California.

25         64.    Later, in or about January and February 2024, BECKMAN acknowledged to at least one

26    GameOn consultant that the Fake Professional Services Company 2 Audit Report did not contain

27    accurate financial information. BECKMAN attempted to shift blame to others for the inaccuracies.

28         65.    Beginning on a date unknown but no later than in or about March 2024 and continuing

INDICTMENT                                          23

1 | through at least in or about May 2024, BECKMAN and LAU distributed the Fake Professional Services

2 | Company 1 Audit Report and the Fake Professional Services Company 2 Audit Report to potential and

3 | existing GameOn investors and their representatives intending to induce their investment in GameOn's

4 | SAFE Offering and to give existing investors a false sense of security regarding GameOn's business and

5 | financial health.  For example, on or about March 19, 2024, a wealth advisor for Investor 5 emailed

6 | LAU asking for a copy of GameOn's audited financial statements.  At the time, Investor 5 expressed an

7 | interest in investing in GameOn's SAFE Offering out of a retirement account, and Investor 5's wealth

8 | advisor had indicated that audited financial statements would be necessary to hold the SAFE in the

9 | retirement account.  Later that evening, LAU sent the wealth advisor via email a copy of the Fake

10 | Professional Services Company 2 Audit Report intending for the wealth advisor to rely on it despite

11 | LAU knowing it contained materially false and fraudulent information and knowing that Professional

12 | Services Company 2 did not author the report.  Unbeknownst to LAU, the wealth advisor did not rely on

13 | the Fake Professional Services Company 2 Audit Report because Investor 5 decided not to invest from

14 | the retirement account.  LAU's email to Investor 5's wealth advisor originated in the Northern District

15 | of California and was received Investor 5's wealth advisor outside California.

16 |       66.    On or about May 30, 2024, BECKMAN wrote to the Professional Services Company 2

17 | audit partner that he and LAU met with back in October 2023, asking for "an update from you on what

18 | we got done in our last back and forth and where we had planned to head next."

19 |       67.    During this part of the scheme, BECKMAN received questions about the Fake

20 | Professional Services Company 2 Audit Report from GameOn's board of directors, officers, and

21 | advisors, including from CFO 1 and Board Secretary 2.  BECKMAN falsely blamed Company 1,

22 | GameOn's outside financial contractors, for the creation of the Fake Professional Services Company 2

23 | Audit Report even though BECKMAN knew neither Company 1 nor any of its contractors was

24 | responsible for the Fake Professional Services Company 2 Audit Report.

25 |     E.  <u>Creating, Sending and Delivering Materially False and Fraudulent Statements Regarding

26 |         GameOn's Account with Financial Institution 1, Including Use of Fake Emails and Fake Account Statements</u>

27 |         a.  <u>Creating and Sending Fake Emails</u>

28 |       68.    As part of the scheme, BECKMAN and LAU knowingly and intentionally made and

INDICTMENT               24

caused to be made materially false, fraudulent, and misleading statements and representations regarding GameOn's account with Financial Institution 1 to GameOn's board of directors, investors, officers, and contractors. To deflect questions and pressure from GameOn's officers while BECKMAN and LAU continued to raise new money through GameOn's SAFE Offering based on false and fraudulent pretenses, BECKMAN created email addresses in the names of real people who were employees of Financial Institution 1, including Financial Advisor 1 and Financial Advisor 2, and knowingly and intentionally caused materially false and fraudulent account statements and information to go to GameOn's CFO 1 and Board Secretary 2 using these fake email accounts. In doing so, BECKMAN intended to make false and fraudulent statements and representations to CFO 1, Board Secretary 2, and the investors represented on GameOn's board of directors and observing GameOn's board of directors. BECKMAN knew that Board Secretary 2 had performed the role of GameOn board secretary and therefore understood that information conveyed to Board Secretary 2 would be conveyed to GameOn's board of directors and board observers.

69.     On or about April 10, 2024, BECKMAN created a fake email account using the name of Financial Advisor 1 and began an email chain with that fake account, BECKMAN, CFO 1, and Board Secretary 2. At the time, CFO 1 and Board Secretary 2 were seeking to use money that BECKMAN had falsely led them to believe existed in GameOn's Financial Institution 1 account and that GameOn needed to meet its business expenses. BECKMAN paid for the fake Financial Advisor 1 email account and domain using BECKMAN's personal credit card. BECKMAN used this fake email account to send false and misleading explanations to CFO 1 and Board Secretary 2 relating to Financial Advisor 1, GameOn's balance and holdings at Financial Institution 1, activity in GameOn's account, and other false and fraudulent information.

70.     On or about April 17, 2024, BECKMAN created three additional fake email addresses in the names of real individuals working for Financial Institution 1. BECKMAN paid for the fake email addresses and associated domain using his personal credit card. BECKMAN tried to make these later-created accounts and their domain appear like professional work emails for Financial Advisor 1 and Financial Advisor 2, another employee of Financial Institution 1. In the following days and weeks, BECKMAN knowingly and intentionally used these fake email accounts to cause false, fraudulent, and

1  misleading information, documents, and explanations to be sent to CFO 1 and Board Secretary 2, who

2  were still seeking information about GameOn's account with Financial Institution 1 and access to

3  GameOn funds that they believed existed.  For example, on or about April 17, 2024, BECKMAN told

4  CFO 1 and Board Secretary 2 that BECKMAN was able to download a statement that had been made

5  available by the fake email for Financial Advisor 1 and then sent the statement to CFO 1 and Board

6  Secretary 2 via email.  The statement that BECKMAN sent to CFO 1 and Board Secretary 2 showed a

7  balance for GameOn's account at Financial Institution 1 of approximately $13.2 million as of March 31,

8  2024, including several Certificates of Deposit or CDs, even though BECKMAN knew that GameOn

9  actually had $0 in its account with Financial Institution 1 on or about March 31, 2024.  BECKMAN also

10  knowingly and intentionally used the fake email accounts to provide materially false, fraudulent, and

11  misleading information to CFO 1 and Board Secretary 2 regarding obstacles to GameOn obtaining

12  money supposedly held by Financial Institution 1, ranging from difficulty breaking Certificates of

13  Deposit early to an investigation of Financial Advisor 1 for misconduct to an armed robbery of

14  BECKMAN in Menlo Park after receiving cashier's checks from Financial Institution 1, none of which

15  were true.

16         71.    Eventually, in or about May 2024 and continuing through in or about June 2024, the

17  GameOn board of directors learned about these communications supposedly with Financial Institution 1

18  employees and questioned BECKMAN about them.  BECKMAN continued to lie to perpetuate the

19  scheme at a time when BECKMAN and LAU continued to raise money for GameOn from outside

20  investors through June 2024.

21             b.  Delivery of Fake Bank Statement to Financial Institution 2 Branch

22         72.    On or about June 3, 2024, an Investor 1 partner serving on GameOn's board of directors

23  arranged to go with BECKMAN to a Financial Institution 2 branch location in the Chinatown

24  neighborhood in San Francisco, California, near GameOn's San Francisco office.  Financial Institution 1

25  was a subsidiary of Financial Institution 2.  The Investor 1 partner wanted to see a statement directly

26  from the bank to know GameOn's true account balance with Financial Institution 1.  At approximately

27  9:43 am on or about June 3, 2024, BECKMAN sent the Investor 1 partner the following message, which

28

1  BECKMAN knew to contain false and fraudulent information:

2                              Mon, Jun 3 at 9:43 AM

3      Hi - went to bank. We are still on security lock however they
       can arrange for a statement to be available for pickup
4      today. Let's plan to meet at office and walk together to the
       bank and we can grab it.
5

6          73.    In the afternoon of June 3, 2024, BECKMAN and the Investor 1 partner arrived at the

7  Financial Institution 2 branch location and picked up an envelope from Bank Employee 1. The envelope

8  contained a statement for GameOn's account at Financial Institution 1 showing a closing balance of

9  $13,353,194.01 as of May 31, 2024. BECKMAN knew this account statement was false and fraudulent

10 and that it did not reflect GameOn's true account balance and account activity. BECKMAN intended to

11 provide that account information, knowing the account balance, holdings, and activity to be materially

12 false, fraudulent, and misleading, to GameOn's board of directors and the investors represented on

13 GameOn's board of directors as part of the scheme to defraud. In reality, GameOn's balance in the

14 account with Financial Institution 1 was $25.93 as of May 31, 2024. The fake account statement that

15 BECKMAN and the Investor 1 partner obtained on or about June 3, 2024, also omitted and modified

16 other account activity that actually occurred in GameOn's account in May 2024, including a $320,000

17 wire transfer to a member of BECKMAN's family that BECKMAN knowingly caused to occur in May

18 2024. The Investor 1 partner believed the statement was real and shared pictures of it with other

19 members of GameOn's board of directors.

20

21

22

23

24

25

26

27

28

INDICTMENT                           27

74.     The fake account statement that BECKMAN and the Investor 1 partner picked up on or about June 3, 2024, was planted at Financial Institution 2 by LAU.  Earlier in the day on or about June 3, 2024, LAU went into the same branch and met with Bank Employee 1.  LAU sent the false and fraudulent GameOn account statement described in paragraph 73 to Bank Employee 1 via email, asking Bank Employee 1 to print it, even though LAU knew the statement to be false and fraudulent.  LAU also knew and intended that the false and fraudulent statement would be picked up by BECKMAN and a GameOn director later that day and used as part of the scheme to defraud GameOn's board of directors and investors represented on GameOn's board.  LAU sent her email to Bank Employee 1 approximately 20 minutes before BECKMAN sent the message described in paragraph 72 to the Investor 1 partner. LAU's email to Bank Employee 1 traveled through a server outside of California.  Bank Employee 1 printed the fake statement and placed it in an envelope and kept it at the branch location until BECKMAN and the Investor 1 partner picked it up later that day.  Security cameras at this branch captured some of the events from on or about June 3, 2024, showing BECKMAN and LAU at the aforementioned branch, including the following still image of LAU arriving there on the morning of June 3, 2024, before she emailed the fake account statement to Bank Employee 1:



75.     The following day, on or about June 4, 2024, as part of the scheme to defraud, BECKMAN knowingly emailed the same fake GameOn account statement depicting an account balance of $13,353,194.01 described in paragraphs 73 and 74 to Board Secretary 2 and CFO 1.

F.   Other Materially False, Fraudulent, and Misleading Statements

76.     BECKMAN and LAU knowingly and intentionally made other materially false, fraudulent, and misleading statements and representations to GameOn investors that were part of the scheme to defraud.

77.     In or about 2020 and in or about 2021, BECKMAN knowingly and intentionally made and caused to be made materially false, fraudulent, and misleading statements to investors about BECKMAN's own experience and qualifications, including statements and representations regarding how much BECKMAN's prior company sold for to make investors believe BECKMAN had a successful prior startup exit.  For example, in or about May 2021, BECKMAN told Investor 1's CFO that a company acquired BECKMAN's prior startup for "a little under 100m – cash and stock," when in truth BECKMAN knew that another company acquired BECKMAN's startup for less than $2 million.

78.     BECKMAN and LAU also told investors about other purported investors that were participating in GameOn's investments and particular funding rounds that BECKMAN and LAU knew were not actually participating.

THE SCHEME AND ARTIFICE TO DEFRAUD GAMEON

79.     In addition to, and in furtherance of, the scheme to defraud GameOn investors, BECKMAN and LAU knowingly and intentionally devised, intended to devise, and participated in a scheme, plan, and artifice to defraud GameOn as to a material matter, and to obtain money and property from GameOn by means of materially false and fraudulent pretenses, representations, and promises, and by omission and concealment of material facts with a duty to disclose, and, for the purpose of executing such scheme or artifice and attempting to do so, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds.

80.     The object of the scheme to defraud GameOn was to deprive GameOn of money in corporate accounts and divert it for BECKMAN and LAU's personal use.

INDICTMENT                                29

81.     As the CEO of GameOn and a member of its board of directors, BECKMAN owed fiduciary duties of care and loyalty to GameOn and its shareholders, and BECKMAN had a duty to disclose to GameOn's board and shareholders each of the actions resulting in the diversion and misappropriation of GameOn funds for BECKMAN and LAU's personal use. LAU also had duties of care and loyalty to GameOn when she acted as GameOn's attorney.

82.     BECKMAN knowingly and intentionally used his control and authority over GameOn's bank accounts to use GameOn's funds, including funds received from investors, for BECKMAN and LAU's personal purposes and expenses. During the relevant period, BECKMAN and LAU diverted millions of dollars from GameOn's corporate accounts to spend on personal expenses unrelated to GameOn's business.

83.     Many aspects of the scheme to defraud investors overlapped with the scheme to defraud GameOn because most of GameOn's funds that BECKMAN and LAU diverted for their own personal use came from outside investors. In addition, GameOn's board of directors included multiple investors and investor representatives, and the board received many of the false and misleading statements relating to GameOn's financials and business that BECKMAN and LAU knowingly and intentionally made and caused to be made. The allegations set forth above in the scheme to defraud GameOn investors are therefore re-alleged here and incorporated by reference.

84.     In particular, it was part of the scheme to defraud GameOn for BECKMAN and LAU to knowingly and intentionally make and cause to be made materially false, fraudulent, and misleading statements, representations, and promises to GameOn's board of directors, officers, other employees, and contractors, and to fail to disclose material information regarding BECKMAN and LAU's use of funds with a duty to disclose. As part of the scheme to defraud GameOn, BECKMAN and LAU knowingly and intentionally created false and fraudulent documents and records, forged documents and records, and false and fraudulent email correspondence using identities of real people. For example, on or about February 9, 2024, BECKMAN sent an email to Board Secretary 2, who was also serving as GameOn's in-house counsel and Chief Operating Officer, describing a $5 million payment from League 1 that in truth did not actually exist. To further support BECKMAN's false statement to Board Secretary 2 regarding the League 1 payment, BECKMAN forwarded a 2022 email chain that contained a

1  message from League 1 Employee 1's email address stating that League 1 would be sending a $5
2  million wire to GameOn.   At the time, BECKMAN knew that League 1 Employee 1 did not actually
3  write that email to BECKMAN and also knew that the payment described in the email from League 1 to
4  GameOn never was promised and never actually happened.

5                    THE SCHEME TO DEFRAUD FINANCIAL INSTITUTION 4

6        85.     As set forth above in paragraph 50, in connection with and as part of their schemes to
7  defraud investors and GameOn, in or about April 2022, BECKMAN and LAU purchased residences
8  located on ▓▓▓▓ Street in San Francisco, California, that they paid for in cash using approximately
9  $4.2 million of GameOn investor funds.  On or about April 13, 2022, BECKMAN told a Financial
10 Institution 4 representative that they obtained the house on ▓▓▓▓ Street that they wanted and "[w]e are
11 going to need to move 4.25 from our GameOn account into our private account and then start the work
12 on the most aggressive io loan we can have from you!!"  On or about April 18, 2022, BECKMAN and
13 LAU's joint account with Financial Institution 4 received transfers of $4,100,000 and $100,000 from
14 GameOn's corporate account with Financial Institution 4.  On or about April 18, 2022, BECKMAN and
15 LAU's joint account with Financial Institution 4 sent the title company approximately $127,500 relating
16 to the purchase of the ▓▓▓▓ Street residences. On or about April 26, 2022, BECKMAN and LAU's
17 joint account with Financial Institution 4 received an additional $100,000 from GameOn's corporate
18 account with Financial Institution 4.  On or about April 26, 2022, BECKMAN and LAU's joint account
19 with Financial Institution 4 transferred an additional $4,131,009.09 to the title company relating to the
20 purchase of the ▓▓▓▓ Street residences.  BECKMAN and LAU knowingly caused these wire
21 transfers.  The funds that BECKMAN and LAU knowingly transferred and caused to be transferred from
22 GameOn and that they used to purchase the ▓▓▓▓ Street residences were GameOn investor funds that
23 were obtained through the scheme to defraud investors and GameOn.

24       86.     After purchasing the ▓▓▓▓ Street residences in April in a cash transaction, BECKMAN
25 and LAU began working to obtain a loan from Financial Institution 4 to put some of the money they
26 took back in GameOn's account with Financial Institution 4.  In doing so, they devised, engaged in, and
27 participated in a scheme to defraud Financial Institution 4 as to a material matter through false,
28 fraudulent, and misleading statements about the source of BECKMAN and LAU's funds used to

INDICTMENT                                     31

1 | purchase the home and their authorization to use GameOn funds in the way that they did.

2       87.     In the early afternoon, on or about June 8, 2022, a Financial Institution 4 representative

3 | contacted BECKMAN and LAU regarding their loan application with Financial Institution 4 in

4 | connection with the ▮▮▮▮ Street residences, asking for a quick call to discuss questions before

5 | Financial Institution 4 submitted BECKMAN and LAU's loan for final approval.

6       88.     In the early evening on or about June 8, 2022, LAU sent BECKMAN two emails within

7 | several minutes of each other, each email attaching one document that BECKMAN and LAU knew to be

8 | materially false, fraudulent, and misleading. Both attachments to LAU's emails described Minutes of

9 | the Meeting of the Board of Directors of GameOn Inc. from January 12, 2022. Both attachments

10 | included the name and electronic signature of Board Secretary 1 as well as the names of GameOn board

11 | members and observers purportedly in attendance at this GameOn board meeting. Although both

12 | attachments included Board Secretary 1's electronic signature, the two versions changed in the

13 | approximately five minutes between LAU's two emails to BECKMAN. Among other changes, LAU's

14 | first version of the minutes described a Founder Note or personal loan for GameOn founders for up to $4

15 | million that was authorized by GameOn's board, and LAU's second version of these minutes described

16 | a Founder Note authorized by GameOn's board for up to $5 million.

17       89.     On or about June 8, 2022, at approximately 5:25 pm, less than five minutes after

18 | receiving LAU's second version of the GameOn board minutes described in paragraph 88, BECKMAN

19 | emailed the Financial Institution 4 representative with whom he had a call earlier that day. The subject

20 | line of the email was "Minutes from the BOD we discussed earlier" and BECKMAN's email attached

21 | the second version of the meeting minutes that LAU had sent BECKMAN that same evening.

22 | BECKMAN wrote the following knowingly false email to the Financial Institution 4 representative:

23         Attached please find the minutes from our Director's Meeting showing approval for founders to
        take out a loan - terms and timelines are spelled out in the minutes and we approved this to be

24         exercisable at founder's request.

25         If you need anything else here please let me know - once we are done with this loan process I
        will be able to calculate interest and payback the company - so we are happy to move along

26         here.

27       90.     While Board Secretary 1 served as a secretary for certain other GameOn board meetings,

28 | Board Secretary 1 did not attend a GameOn board of directors meeting on or about January 12, 2022.

INDICTMENT                 32

1   Board Secretary 1 did not apply his name and signature to minutes from the board meeting described in

2   paragraphs 88 and 89, and he did not authorize LAU, BECKMAN, and anyone else to use his name and

3   signature in connection with these meeting minutes.  BECKMAN and LAU knew these facts at the time

4   they created the minutes described in paragraphs 88 and 89 and sent them to Financial Institution 4.

5       91.    A Founder Note was not approved by GameOn's board of directors authorizing a loan up

6   to $5 million to BECKMAN at the January 12, 2022 GameOn board meeting.  BECKMAN and LAU

7   knew that fact at the time they created the minutes described in paragraphs 88 and 89 and sent them to

8   Financial Institution 4.  BECKMAN and LAU also knew there was no Founder Note when they

9   knowingly caused the wire transfers in connection with the April 2022 purchase of the ███████ Street

10  residences, as further described in paragraps 50 and 85.

11      92.    On or about June 28, 2022, BECKMAN and LAU finalized a loan with Financial

12  Institution 4 for $2,550,000.  On or about July 6, 2022, BECKMAN and LAU's account with Financial

13  Institution 4 transferred $2,541,875.76 back to GameOn.

14                    LAU'S DELETION AND ATTEMPTED DELETION OF RECORDS

15      93.    LAU knowingly and corruptly attempted to delete, destroy, and conceal records with the

16  intent to impair their integrity and availability for use in a grand jury investigation that was pending in

17  the Northern District of California and that was known by, and reasonably foreseeable to, LAU.

18      94.    Specifically, on or about August 8, 2024, LAU spoke to individuals working for Venture

19  Capital Firm 1 who asked LAU about publicly reported allegations regarding BECKMAN and GameOn

20  from an online article published in July 2024.  In this meeting, LAU denied working on GameOn

21  matters, but Venture Capital Firm 1's representatives instructed LAU to return her work laptop to

22  Venture Capital Firm 1's offices immediately.

23      95.    LAU did not immediately return her laptop to Venture Capital Firm 1 and instead first

24  knowingly and corruptly attempted to delete hundreds of records from a folder in her personal drive with

25  Venture Capital Firm 1 relating to GameOn and another company that LAU knew was associated with

26  BECKMAN before returning the laptop on or about August 8, 2024.  When LAU attempted to delete

27  files related to GameOn held in her personal drive with Venture Capital Firm 1, a federal grand jury

28  investigation relating to GameOn, BECKMAN, and LAU was pending in the Northern District of

1  California and was known by, and reasonably foreseeable to, LAU.

2        96.    In a subsequent meeting that occurred between LAU and Venture Capital Firm 1's

3  representatives on or about August 20, 2024, LAU changed her story regarding her work for GameOn

4  from the previous meeting.  LAU also knowingly and intentionally offered false excuses for attempting

5  to delete files from her personal drive with Venture Capital Firm 1 but acknowledged doing so.

6        97.    On a date unknown, LAU knowingly and corruptly deleted and caused to be deleted

7  multiple email communications reflecting her involvement in the aforementioned schemes and offenses,

8  including the June 3, 2024 email from LAU to Bank Employee 1 attaching the fake statement for

9  GameOn's Financial Institution 1 account, which is described further in paragraph 74.

10        98.    On a date unknown, LAU also knowingly and corruptly attempted to delete other files

11  relating to GameOn from Venture Capital Firm 1's records and her Venture Capital Firm 1 laptop that

12  she returned to Venture Capital Firm 1 on or about August 8, 2024, including fake GameOn invoices

13  depicting non-customers and GameOn revenue that never existed and fake Financial Institution 1

14  account statements showing materially inflated GameOn account balances.

15  <u>COUNTS ONE THROUGH NINE:</u>       (18 U.S.C. §§ 1343, 2 – Wire Fraud)

16        99.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set

17  forth here.

18        100.    Beginning on a date unknown but no later than in or about September 2018 and

19  continuing through in or about July 2024, in the Northern District of California and elsewhere, the

20  defendant,

21                   ALEXANDER CHARLES BECKMAN,

22  knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and

23  artifice to defraud as to a material matter, and to obtain money and property by means of materially false

24  and fraudulent pretenses, representations, and promises, and by means of omission and concealment of

25  material facts.

26        101.    Beginning on a date unknown but no later than in or about April 2022 and continuing

27  through in or about July 2024, in the Northern District of California and elsewhere, the defendant,

28                   VALERIE LAU BECKMAN, a/k/a Valerie Lau,

INDICTMENT               34

1  knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and

2  artifice to defraud as to a material matter, and to obtain money and property by means of materially false

3  and fraudulent pretenses, representations, and promises, and by means of omission and concealment of

4  material facts.

5      102.    On or about the dates listed below, in the Northern District of California and elsewhere,

6  for the purpose of executing the aforementioned scheme and artifice to defraud GameOn investors and

7  attempting to do, the defendants named below did knowingly transmit and cause to be transmitted in

8  interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals,

9  pictures, and sounds, specifically, electronic funds transfers and payments and emails, as set forth

10 below, each transaction being a separate count:

| COUNT | DATES | DEFENDANTS | APPROX. AMOUNT (IF APPLICABLE) | WIRE TRANSMISSION |
|---|---|---|---|---|
| 1 | May 21, 2021 | ALEXANDER CHARLES BECKMAN | $800,000 | FEDWIRE Transfer of Funds from Investor 1's Fund to GameOn's Account with Financial Institution 3 |
| 2 | November 12, 2021 | ALEXANDER CHARLES BECKMAN | $799,998.88 | FEDWIRE Transfer of Funds from Investor 1's Fund to GameOn's Account with Financial Institution 3 |
| 3 | January 28, 2022 | ALEXANDER CHARLES BECKMAN | $2,250,000 | FEDWIRE Transfer of Funds from Investor 2's Fund to GameOn's Account with Financial Institution 3 |
| 4 | July 11, 2023 | ALEXANDER CHARLES BECKMAN, and VALERIE LAU BECKMAN, a/k/a Valerie Lau | $2,000,000 | FEDWIRE Transfer of Funds from Investor 3's Fund to GameOn's Account with Financial Institution 4 |
| 5 | July 11, 2023 | ALEXANDER CHARLES BECKMAN, and VALERIE LAU BECKMAN, a/k/a Valerie Lau | $1,000,000 | FEDWIRE Transfer of Funds from Investor 3's Fund to GameOn's Account with Financial Institution 4 |

INDICTMENT                                      35

| 6 | October 23, 2023 | ALEXANDER CHARLES BECKMAN, and<br><br>VALERIE LAU BECKMAN, a/k/a Valerie Lau | | Email from BECKMAN to GameOn Board of Directors and Observers, Including Representatives of Investor 1, Investor 4, and Investor 6, and Board Secretary 2, Attaching Fake Financial Services Company 2 Audit Report and Other Materially False and Fraudulent Financial Information and Other Information Regarding GameOn's Business |
| 7 | January 8, 2024 | ALEXANDER CHARLES BECKMAN, and<br><br>VALERIE LAU BECKMAN, a/k/a Valerie Lau | $100,000 | FEDWIRE Transfer of Funds from Investor 2 to GameOn's Account with Financial Institution 4 |
| 8 | March 19, 2024 | ALEXANDER CHARLES BECKMAN, and<br><br>VALERIE LAU BECKMAN, a/k/a Valerie Lau | | Email from LAU to Wealth Advisor of Investor 5 Attaching Fake Professional Services Company 2 Audit Report |
| 9 | June 3, 2024 | ALEXANDER CHARLES BECKMAN, and<br><br>VALERIE LAU BECKMAN, a/k/a Valerie Lau | | Email from Lau to Bank Employee 1 Attaching Fake GameOn Account Statement |

The wire communications described in Count 6 and Count 9 were also for the purpose of executing the aforementioned scheme and artifice to defraud GameOn and attempting to do so.

All in violation of Title 18, United States Code, Sections 1343 and 2.

<u>COUNT TEN:</u>                             (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud Against GameOn Investors)

103.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set

INDICTMENT                             36

1   forth here.

2        104.    Beginning on a date unknown but no later than in or about April 2022 and continuing

3   through in or about July 2024, in the Northern District of California and elsewhere, the defendants,

4                          ALEXANDER CHARLES BECKMAN, and

5                          VALERIE LAU BECKMAN, a/k/a Valerie Lau,

6   did knowingly conspire to devise and intend to devise a scheme and artifice to defraud GameOn's

7   potential and existing investors as to a material matter and to obtain money and property by means of

8   materially false and fraudulent pretenses, representations, and promises, and by omission and

9   concealment of material facts, specifically, by soliciting investments into GameOn through making the

10  false and fraudulent representations as set forth in this Indictment, and, for the purpose of executing such

11  scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by means of wire

12  communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds,

13  in violation of Title 18, United States Code, Section 1343.

14        All in violation of Title 18, United States Code, Section 1349.

15  COUNT ELEVEN:                    (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud
                                     Against GameOn)
16

17        105.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set

18  forth here.

19        106.    Beginning on a date unknown but no later than in or about April 2022 and continuing

20  through in or about July 2024, in the Northern District of California and elsewhere, the defendants,

21                         ALEXANDER CHARLES BECKMAN, and

22                         VALERIE LAU BECKMAN, a/k/a Valerie Lau,

23  did knowingly conspire to devise and intend to devise a scheme and artifice to defraud GameOn as to a

24  material matter and to obtain money and property by means of materially false and fraudulent pretenses,

25  representations, and promises, and by omission and concealment of material facts with a duty to

26  disclose, specifically, by making the false and fraudulent representations to GameOn's board of

27  directors, board observers, board secretaries, officers, contractors, and employees to defraud GameOn of

28  its money and property as set forth in this Indictment, and, for the purpose of executing such scheme and

INDICTMENT                              37

1  artifice and attempting to do so, did transmit, and cause to be transmitted, by means of wire

2  communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds,

3  in violation of Title 18, United States Code, Section 1343.

4      All in violation of Title 18, United States Code, Section 1349.

5  <u>COUNTS TWELVE THROUGH FOURTEEN:</u>      (15 U.S.C. § 78j(b) and 78ff; 17 C.F.R. § 240.10b-5
                                                     – Securities Fraud; 18 U.S.C. § 2)
6

7      107.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set

8  forth here.

9      108.    In or about the date ranges listed in the chart below, in the Northern District of California

10  and elsewhere, the defendants named in the chart below willfully and knowingly, directly and indirectly,

11  by the use of means and instrumentalities of interstate commerce, in connection with the purchase and

12  sale of securities, used and employed manipulative and deceptive devices and contrivances by (a)

13  employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and

14  omitting to state material facts necessary in order to make the statements made, in the light of the

15  circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and

16  courses of business which operated and would operate as a fraud and deceit upon persons, specifically,

17  the use of the above devices, schemes and artifices to defraud, false statements and omissions of

18  material facts, and acts of fraud and deceit in connection with the following securities offerings to

19  investors conducted during the following approximate time periods, each offering being a separate

20  count:

| COUNT | DEFENDANTS | DATES | OFFERING |
|---|---|---|---|
| 12 | ALEXANDER CHARLES BECKMAN | In or about September 2021 though in or about December 2022 | GameOn Series B Preferred Stock Offering Offered to Investor 1, Investor 2, Investor 4, and Others |
| 13 | VALERIE LAU BECKMAN, a/k/a Valerie Lau | In or about April 2022 through in or about December 2022 | GameOn Series B Preferred Stock Offering Offered to Investor 4 and Others |
| 14 | ALEXANDER CHARLES BECKMAN, and<br><br>VALERIE LAU BECKMAN, a/k/a | In or about May 2023 through in or about June 2024 | GameOn SAFE Offering Offered to Investor 2, Investor 3, Investor 5, and Others |

| | Valerie Lau | | |
|---|---|---|---|

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

COUNT FIFTEEN:                    (18 U.S.C. § 371 – Conspiracy to Commit Securities Fraud)

109.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set forth here.

110.    Beginning on a date unknown but no later than in or about April 2022 and continuing through in or about July 2024, in the Northern District of California and elsewhere, the defendants,

ALEXANDER CHARLES BECKMAN, and

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

did knowingly and willfully conspire and agree together and with each other to commit offenses against the United States, namely securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5.

111.    It was a part and an object of the conspiracy that defendants BECKMAN and LAU knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b5-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5.

112.    In furtherance of the conspiracy and to effect the objects of it, defendants BECKMAN and LAU committed the following overt acts, among others, in the Northern District of California and elsewhere:

INDICTMENT                          39

a. On or about June 27, 2023, BECKMAN sent an email to an Investor 3 partner, copying LAU and others, attaching a fake bank statement for GameOn's account with Financial Institution 1 that included false and fraudulent representations regarding GameOn's revenue from League 1.

b. On or about October 19, 2023, BECKMAN sent LAU via email an audit report for GameOn's 2022 financial statements purportedly authored by Professional Services Company 2. BECKMAN created this false and fraudulent audit report by modifying the Genuine Professional Services Company 2 Audit Report that LAU had sent BECKMAN by email on or about July 27, 2023.

c. On or about October 23, 2023, BECKMAN sent LAU an email with the subject line "attached please take look," attaching the Fake Professional Services Company 2 Audit Report along with other GameOn board materials containing false and fraudulent information about GameOn.

d. On or about October 23, 2023, and before BECKMAN distributed the Fake Professional Services Company 2 Audit Report to anyone else, BECKMAN emailed LAU and attached the Genuine Professional Services Company 2 Audit Report that LAU had previously sent BECKMAN on or about July 27, 2023.

e. On or about October 23, 2023, BECKMAN emailed the Fake Professional Services Company 2 Audit Report to GameOn's board of directors and board observers, including representatives of Investor 1, Investor 4, and Investor 6, blind copying LAU and his own personal email address on the correspondence.

f. On or about March 19, 2024, LAU sent an email to a wealth advisor for Investor 5, who was considering an investment in GameOn's SAFE Offering, that attached the Fake Professional Services Company 2 Audit Report.

g. On or about April 22, 2024, BECKMAN sent an email to a potential investor in GameOn's SAFE Offering attaching the Fake Professional Services Company 1 Audit Report. LAU was copied on BECKMAN's email.

INDICTMENT

h. On or about May 17, 2024, BECKMAN sent an email to a potential investor in GameOn's SAFE Offering attaching the Fake Professional Services Company 2 Audit Report. LAU was copied on BECKMAN's email.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT SIXTEEN</u>:                                 (18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud)

113. Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set forth here.

114. Beginning on a date unknown, but no later than in or about April 2022, and continuing through in or about July 2022, in the Northern District of California and elsewhere, the defendants,

ALEXANDER CHARLES BECKMAN, and

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

did knowingly conspire to devise and intend to devise a scheme and artifice to defraud Financial Institution 4, which was a financial institution insured by the Federal Deposit Insurance Corporation, as to a material matter and to obtain moneys, funds, credits, assets, and other property owned by, and under the custody and control of Financial Institution 4 by means of materially false and fraudulent pretenses, representations, and promises, and by omission and concealment of material facts, in violation of Title 18, United States Code, Section 1344. In sum and substance, BECKMAN and LAU knowingly conspired and intended to devise a scheme to defraud Financial Institution 4 in connection with BECKMAN and LAU's purchase of personal residences located at ███████ ████ Street, San Francisco, California ████, and in connection with a loan from Financial Institution 4 relating to the purchase of the aforementioned residences with materially false, fraudulent, and misleading information about (1) BECKMAN and LAU's source of funds to purchase the aforementioned residences, (2) an investor fraud scheme that generated those funds, (3) the GameOn board of directors' authorization of BECKMAN's use of GameOn's corporate funds for a personal loan up to $5 million, and (4) meeting minutes bearing the name and electronic signature of Board Secretary 1 and the names of members of GameOn's board of directors.

All in violation of Title 18, United States Code, Section 1349.

//

COUNT SEVENTEEN:                        (18 U.S.C. §§ 1014, 2 – False Statements to a Bank or
                                        Other Federally Insured Institution)

115.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set forth here.

116.    Between in or about April 2022 and continuing through in or about July 2022, in the Northern District of California and elsewhere, the defendants,

ALEXANDER CHARLES BECKMAN, and

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

knowingly made false statements for the purpose of influencing the action of Financial Institution 4, which was a financial institution insured by the Federal Deposit Insurance Corporation, in connection with BECKMAN and LAU's application for a loan and financial transactions relating to the acquisition of personal residences by BECKMAN and LAU, specifically, BECKMAN and LAU knowingly made what they knew were false and misleading statements and representations to Financial Institution 4 regarding (1) BECKMAN and LAU's source of funds to purchase personal residences located at ███ ███ ███ Street, San Francisco, California ███, (2) an investor fraud scheme that generated those funds, (3) the GameOn board of directors' authorization of BECKMAN's use of GameOn's corporate funds for a personal loan up to $5 million, and (4) meeting minutes bearing the name and electronic signature of Board Secretary 1 and the names of members of GameOn's board of directors.

All in violation of Title 18, United States Code, Sections 1014 and 2.

COUNT EIGHTEEN:                         (18 U.S.C. §§ 1957, 2 – Engaging in Monetary
                                        Transactions in Property Derived from Specified Unlawful
                                        Activity)

117.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set forth here.

118.    Among other transactions, on or about April 26, 2022, in the Northern District of California and elsewhere, the defendants,

ALEXANDER CHARLES BECKMAN, and

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

did knowingly engage in monetary transactions by, through, and to a financial institution insured by the

INDICTMENT                                      42

1 Federal Deposit Insurance Corporation, in and affecting interstate and foreign commerce, in criminally

2 derived property of a value greater than $10,000, such funds having been derived from specified

3 unlawful activity, that is wire fraud and wire fraud conspiracy, as alleged in Counts One through Eleven,

4 specifically, a wire transfer of approximately $4,131,009.09 to a title company in connection with the

5 defendants' purchase of residences located at ████████ ████ Street, San Francisco, California

6 ██.

7    All in violation of Title 18, United States Code, Sections 1957 and 2.

8 <u>COUNTS NINETEEN THROUGH TWENTY-FOUR</u>:    (18 U.S.C. §§ 1028A(a)(1), (c)(4), and
                                                     (c)(5), and 2 – Aggravated Identity Theft)
9

10    119.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set

11 forth here.

12    120.    On or about the dates listed below, in the Northern District of California and elsewhere,

13 the defendants named in the chart below did knowingly use, without lawful authority, the means of

14 identification of another person, specifically, the means of identification listed in the table below, during

15 and in relation to the felony violations described in the chart below, each person described in the chart

16 being a separate count:

| COUNT | DEFENDANTS | DATES | MEANS OF IDENTIFICATION | DURING AND IN RELATION TO |
|---|---|---|---|---|
| 19 | ALEXANDER CHARLES BECKMAN, and VALERIE LAU BECKMAN, a/k/a Valerie Lau | On or about June 8 and 9, 2022 | Board Secretary 1's name and electronic signature | Conspiracy to Commit Bank Fraud, as alleged in Count 16, and False Statements to a Bank or Other Federally Insured Institution, as alleged in Count 17 |
| 20 | ALEXANDER CHARLES BECKMAN | In or about February 2023 through in or about June 2024 | Contractor 1's name, initials, and an email address and emails using Contractor 1's name and initials | Wire Fraud and Conspiracy to Commit Wire Fraud, as alleged in Counts 1–11 |
| 21 | ALEXANDER CHARLES BECKMAN | In or about October 2023, and continuing through in or about April 2024 | CFO 1's name, initials, and an email address and emails using CFO 1's name and initials | Wire Fraud and Conspiracy to Commit Wire Fraud, as alleged in Counts 1–11 |

INDICTMENT                                    43

| 22 | ALEXANDER CHARLES BECKMAN | On or about February 9, 2024 | League 1 Employee 1's name and email address | Wire Fraud and Conspiracy to Commit Wire Fraud, as alleged in Counts 1–11 |
|---|---|---|---|---|
| 23 | ALEXANDER CHARLES BECKMAN | On or about April 10, 2024, and continuing through on or about April 19, 2024 | Financial Advisor 1's name, initials, and email addresses and emails using Financial Advisor 1's name and initials | Wire Fraud and Conspiracy to Commit Wire Fraud, as alleged in Counts 1–11 |
| 24 | ALEXANDER CHARLES BECKMAN | On or about April 17, 2024, and continuing through on or about May 27, 2024 | Financial Advisor 2's name, initials, and an email address and emails using Financial Advisor 2's name and initials | Wire Fraud and Conspiracy to Commit Wire Fraud, as alleged in Counts 1–11 |

All in violation of Title 18, United States Code, Sections 1028A(a)(1), (c)(4), and (c)(5) and 2.

COUNT TWENTY-FIVE:                (18 U.S.C. § 1512(c)(1) – Obstruction of Justice)

121.    Paragraphs 1 through 98 of this Indictment are re-alleged and incorporated as if fully set forth here.

122.    Between on or about August 8, 2024, and on or about August 20, 2024, in the Northern District of California, the defendant,

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

did knowingly and corruptly alter, destroy, mutilate, and conceal records, documents, and other objects, and attempt to do so, with the intent to impair their integrity and availability for use in an official proceeding, namely, a federal grand jury investigation that was pending in the Northern District of California.

All in violation of Title 18, United States Code, Section 1512(c)(1).

FORFEITURE ALLEGATION:        (18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c); 18 U.S.C. §§ 982(a)(1), 982(a)(2))

123.    The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), Section 982(a)(1), 982(a)(2), and Title 28, United States Code, Section 2461(c).

INDICTMENT                44

124.    Upon conviction for any of the offenses set forth in Counts 1 through 17 of this Indictment, the defendants,

ALEXANDER CHARLES BECKMAN and,

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendants obtained directly and indirectly, as the result of those violations, including but not limited to the following:

    a.  The residences and real property located at ███████  ██████ Street, San Francisco, California ████;

    b.  One black Tesla Model X with Falcon Wing doors and Vehicle Identification Number 7SAXCBE6XNF329766; and

    c.  One black Apple iPhone and one Apple laptop bearing serial number GHXVFK2QQL, both of which were voluntarily given to the FBI on July 15, 2024.

125.    Upon conviction of the offense set forth in Count 18 of this Indictment, the defendants,

ALEXANDER CHARLES BECKMAN and,

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, constituting, or derived from proceeds the defendants obtained directly and indirectly, as the result of those violations, including but not limited to the following:

    a.  The residences and real property located at ███████  ██████ Street, San Francisco, California ████.

126.    Upon conviction of any of the offenses set forth in Counts 19 through 24 of this Indictment, the defendants,

ALEXANDER CHARLES BECKMAN and,

VALERIE LAU BECKMAN, a/k/a Valerie Lau,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(2) and 981(a)(1)(C), any property constituting or derived from proceeds the defendant obtained, directly or

INDICTMENT

45

1   indirectly, as the result of such violation and any personal property used or intended to be used to

2   commit, or facilitate the commission, of the offense.

3       127.    If any of the property described above, as a result of any act or omission of the

4   defendants:

5           a.    cannot be located upon exercise of due diligence;

6           b.    has been transferred or sold to, or deposited with, a third party;

7           c.    has been placed beyond the jurisdiction of the court;

8           d.    has been substantially diminished in value; or

9           e.    has been commingled with other property which cannot be divided without

10              difficulty,

11  the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

12  United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

13      All pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code,

14  Section 2461(c); Title 18, United States Code, Section 982(a)(1); Title 18, United States Code, Section

15  982(a)(2); and Federal Rule of Criminal Procedure 32.2.

16

17  DATED: January 21, 2025                    A TRUE BILL.

18

19                                   _____/s/_____
                                     FOREPERSON
20

21  PATRICK D. ROBBINS
    Attorney for the United States
22  Acting Under Authority Conferred by 28 U.S.C. § 515

23

24  /s/ Patrick O'Brien
    PATRICK K. O'BRIEN
25  Assistant United States Attorney

26

27

28

INDICTMENT                               46

Exhibit B

## EXHIBIT B

The land referred to is situated in the County of San Francisco, City of San Francisco, State of California, and is described as follows:

Beginning at a point on the Southerly fine of Jackson Street, distant thereon 100 feet Easterly from the comer formed by the intersection of the Southerly line of Jackson Street with the Northeasterly line of Arguello Boulevard (formerly called First Avenue), running thence Easterly along said line of Jackson Street 27 feet; thence Southwesterly on a line parallel with said line of Arguello Boulevard (formerly called First Avenue) 128 feet 4 inches; thence Westerly on a line parallel with said line of Jackson Street 27 feet; thence Northeasterly on a line parallel with said line of Arguello Boulevard (formerly called First Avenue) 128 feet 4 inches to the point of beginning.

Being a portion of Western Addition Block No. 850

Assessor's Lot 019; Block 0990